IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AIR TRANSPORT ASSOCIATION OF
AMERICA, INC., dba AIRLINES FOR
AMERICA,

       Plaintiff,

  v.

MICHAEL J. JORDAN, in his official capacity
as Director of the Bureau of Environmental
Services of the City of Portland, Oregon, et al,

       Defendants.

No. 3:16-cv-00230-HZ

OPINION & ORDER

David G. Hosenpud
Lane Powell, PC
601 SW Second Ave., Ste. 2100
Portland, OR 97204

M. Roy Goldberg
Steptoe & Johnson
1330 Connecticut Ave., N.W.
Washington, DC 20036

    Attorneys for Plaintiff

OPINION & ORDER - 1

Terence L. Thatcher
J. Scott Moede
Rebeca A. Plaza
Portland City Attorney's Office
1211 SW 4th Ave., Rm. 430
Portland, OR 97204

    Attorneys for Defendants

HERNÁNDEZ, District Judge:

    Plaintiff Air Transport Association of America (also known as Airlines for America, or "A4A") is an industry group that represents airline companies, many of which operate out of the Portland International Airport. They seek to enjoin the Defendant City of Portland from imposing certain fees associated with storm water and sewer management against the Port of Portland, the entity who owns and operates the airport. The airlines argue that the fees violate a federal statute that limits how airport revenues are spent. The City argues that A4A lacks standing to bring this case because the economic injuries they allege as a result of the fees are not caused by the City, but rather the independent decision of the Port of Portland to pass those fees to airlines as an operating cost of the airport. The Court agrees. Accordingly, the City's motion to dismiss for lack of subject matter jurisdiction is granted, A4A's motion for a preliminary injunction is denied, and this case is dismissed.

BACKGROUND

    The City of Portland operates city-wide sewer and storm water management systems. Def. Resp. at 2, ECF 28. The storm water system manages two categories of storm water: run-off from private and non-City property ("on-site") and run-off from thousands of miles of City streets ("off-site"). Id. The City charges ratepayers to cover the costs of constructing, operating, maintaining the system. Id. Approximately 35% of City's total costs are allocated to on-site fees, and 65% are allocated to off-site fees. First Amended Complaint ("FAC") ¶ 30.

Part of the City's obligation in running these systems includes the investigation of hazardous substance contamination in the Willamette River at the Portland Harbor Superfund Site.[1] Def. Mot. to Dismiss at 1, ECF 26. "The City, by virtue of the decades of discharges in the Willamette River from its sewer and storm water system has been identified by the Environmental Protection Agency as a party 'potentially responsible' for some of the river's contamination." Def. Resp. at 5. In 2012, the City passed an ordinance assessing on all ratepayers a Willamette River/Portland Harbor Superfund fee. Def. Mot. to Dismiss at 1; *Amicus* Brief of Port of Portland at 3, ECF 43. "Because all City ratepayers use and have for years used the City's storm water management system, . . . the City's Portland Harbor fee is designed so that all ratepayers help pay for the Harbor investigation." Def. Mot. to Dismiss at 1.

The Port of Portland is a "port district" in the State of Oregon that owns and operates Portland International Airport ("PDX" or the "Airport"), along with marine terminals and numerous business and industrial parks. *Amicus* Brief of Port of Portland at 3; Port of Portland 2016–17 Proposed Budget at 9, available at http://cdn.portofportland.com/pdfs/StrategicPlanBudget_16_17_Proposed.pdf. The Port is one of the City's ratepayers for sewer and storm water services. FAC ¶ 30. However, the Airport has its own on-site storm water management system that discharges into the Columbia River. Accordingly, the City charges the Port "only for [the Airport's] share of the City's off-site management costs, that is the costs of keeping City roads clear of water, and the Portland Harbor Superfund charges." Def. Mot. at 2.

---

[1] "The Portland Harbor Superfund Site in Portland, Oregon, is the result of more than a century of industrial use along the Willamette River. Water and sediments along Portland Harbor are contaminated with many hazardous substances, including heavy metals, polychlorinated biphenyls (PCBs), polynuclear aromatic hydrocarbons (PAH), dioxin, and pesticides . . . . Portland Harbor was added to EPA's National Priorities List in December 2000." Portland Harbor Superfund Site, U.S. Environmental Protection Agency, Region 10, https://yosemite.epa.gov/R10/CLEANUP.NSF/ph/Portland+Harbor+Superfund+Site (last visited May 13, 2016).

A4A is a trade organization that represents the principle U.S. airlines, many of which serve PDX. The airlines that operate out of PDX ("Airlines") have a lease agreement with the Port that allows the Airlines to use certain airport facilities. Supp. Berg. Decl. Ex. 1 at 15, ECF 40-1. The lease agreement is "a hybrid compensatory-residual agreement, whereby the Airlines are ultimately responsible for the costs incurred to operate the airfield and terminal portions of the Airport," which includes the City's off-site storm water and Superfund fees (collectively "Fees"). Supp. Berg Decl. ¶ 4 (some capitalization added).

A4A asserts that the City's Fees, charged to the Port and passed on to the Airlines, violate the so-called Anti-Revenue Diversion Provision of the Federal Aviation Act, codified at 49 U.S.C. § 47133(a). That statute provides:

> a) Prohibition.--Local taxes on aviation fuel (except taxes in effect on December 30, 1987) or **the revenues generated by an airport** that is the subject of Federal assistance **may not be expended for any purpose other than the capital or operating costs of**--
>  (1) **the airport**;
>  (2) the local airport system; or
>  (3) any other local facility that is owned or operated by the person or entity that owns or operates the airport that is directly and substantially related to the air transportation of passengers or property.

49 U.S.C. § 47133(a) (emphasis added). A4A alleges that "[n]either PDX nor the airlines receive any services from [The City] in exchange for payment of the Fees. Rather, the millions of dollars in Fees are entirely allocated to projects having no relationship whatsoever to the Airport." Pl. Mot. for Preliminary Injunction at 2, ECF 11. Thus, A4A argues, the Fees are not an "operating cost" of the Airport that can be paid with airport revenues under the statute.

The dispute between these parties reaches back to 2012, when the Airlines first complained to the Port and the City about the Fees. Def. Resp. at 6, ECF 28. A4A then raised this issue with the Federal Aviation Administration ("FAA"), the federal agency charged with

enforcing 49 U.S.C. § 47133(a) and other provisions of the Federal Aviation Act. Def. Resp. at 6. A4A told the FAA that the Port was breaking federal law by using airport revenues to pay the Fees. The FAA conducted an investigation, and representatives from the City, the Port, the A4A, and the FAA met in Portland to discuss the Airlines' concerns. Def. Resp. at 6.

Ultimately, the FAA disagreed with A4A. Randall Fiertz, the Director of the FAA's Office of Airport Compliance and Management Analysis, wrote in a letter to A4A that the FAA "believe[s] that the City of Portland's storm water management charge is an operating cost of the Airport, because it arises as a legal obligation incident to the Airport's possessory interest in land necessary for the provision of aeronautical services." Plaza Decl. Ex. 6 at 1 ("FAA Letter"), ECF No. 31-1 (some capitalization added). "It further appears," Mr. Fiertz continued, "that the stormwater management charge is allocated to all ratepayers within the jurisdiction, including the Port of Portland, based upon a transparent, uniform, and non-discriminatory rate-setting methodology." FAA Letter at 1. "In the absence of any indication that the Airport has been disproportionately targeted by the city . . . or that the Airport has otherwise been overcharged for these services, . . . we are not prepared to find that the charges exceed the value of services provided to the Airport." FAA Letter at 1 (some capitalization added). Mr. Fiertz encouraged A4A to continue working with the Port and the City and other agencies to "resolve the matter locally," but that if such efforts proved fruitless, he advised A4A that it "may file a formal complaint with FAA[.]" FAA Letter at 1. And, in fact, the A4A has commenced an action before the FAA formally challenging the Port's ability to bill the Airlines for the City's Fees. Thatcher Decl. Ex. 6, ECF 27-1.

At the same time, A4A asks this Court to enjoin the City's collection of Fees from the Port. A4A asserts the its member airlines will suffer irreparable harm if they are forced to pay the

Fees because "there is no private right of action to pursue a claim for damages for violation of 49 U.S.C. § 47133(a). As a result, the Airlines will have no opportunity to recover the amounts paid" to the City for off-site storm water management or the Superfund fee. Pl. Mot. at 2 (some capitalization added).

The City opposes the motion for a preliminary injunction. The City argues that A4A's claims are not likely to succeed on the merits because the statute at issue does not provide a private cause of action. A4A concedes that point but asks the Court to exercise its equitable jurisdiction and allow it to challenge the City's Fees as an illegal diversion of airport revenues.

The City also moved separately to dismiss the case on a number of grounds, most importantly that A4A lacks constitutional standing to bring this case. The City asserts that it does not bill the Airlines for the Fees—rather the City bills the Port, who then bills the Airlines. Thus, the harm A4A alleges in this case is not caused by the City's assessment of Fees on the Airport, but rather the Port's independent decision about how to pay the bill. Therefore, the City asserts, A4A lacks standing to bring this case against the City.

STANDARDS

1. Preliminary Injunction

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Resources Defense Council, 555 U.S. 7, 22 (2008). The party seeking the injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. Id. at 20. A court can only issue an injunction if the plaintiff carries its burden of persuasion by a "clear showing" of the four required elements. Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir.

2012). Because an injunction is an equitable remedy, the court may apply a sliding test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

   2. Standing

Article III of the Constitution limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004) (explaining that an Article III federal court lacks subject matter jurisdiction over a suit brought by a plaintiff lacking standing). Standing is the "personal interest that must exist at the commencement of the litigation." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 170 (2000).

To establish Article III standing, a plaintiff must show three elements. First, it must have suffered "an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (quotation marks and citations omitted). Second, it must show that the injury is "fairly traceable to the challenged action of the defendant," and is not "the result of the independent action of some third party not before the court." Id. (quotation marks and alternations omitted). Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 561 (quotation marks omitted); see also Ass'n of Pub. Agency Customers v. Bonneville Power Admin., 733 F.3d 939, 950 (9th Cir. 2013). "The party invoking

federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561(citations omitted).

A challenge to standing is appropriately raised pursuant to Federal Rule of Civil Procedure 12(b)(1). Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011) ("lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).") (emphasis omitted). The court may hear evidence regarding subject matter jurisdiction and resolve factual disputes where necessary. Kingman Reef Atoll Invs., LLC v. United States, 541 F.3d 1189, 1195 (9th Cir. 2008); Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003). "Each element of standing 'must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.' " Maya, 658 F.3d at 1068 (quoting Lujan, 504 U.S. at 561). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." Id. (quoting Warth v. Seldin, 422 U.S. 490, 50 (1975)).

## DISCUSSION

Before examining the likelihood that A4A's claims will succeed on the merits or whether the statute at issue here allows for an implied private cause of action, the Court must first address the issue of standing. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101–02 (1998) (holding that the question whether plaintiff has standing must be answered before addressing whether a federal statute provides plaintiff with a cause of action.). Not only must standing come first, but the Court must definitively resolve standing in A4A's favor to reach the other issues. In other words, the Court cannot assume for the sake of analysis that standing exists, even if the result of the case would be the same under either a jurisdictional or merits analysis. Sizer v. New

England Fin., No. CVLO-553-PK, 2010 WL 5101531, at *4 (D. Or. Sept. 22, 2010) (citing Steel Co., 523 U.S. at 93).

Here, there is no dispute over the first or third elements of standing. "The City does not dispute that the economic interests of [A4A's] member airlines in reducing their costs are affected if they pay the Port for fees assessed by the City." Def. Reply at 5. "Nor can the City deny that were this Court to forbid the City from assessing its fees, . . . [A4A] and its member[s] would see a financial advantage." Def. Reply at 5.

The key question is whether A4A can show its economic harms are "fairly traceable" to the City's conduct, and not the result of the independent action of a third party not before the Court. Lujan, 504 U.S. at 560. To survive a motion to dismiss for lack of constitutional standing, A4A must establish a "line of causation" between the City's action and the alleged harm that is more than "attenuated." Allen v. Wright, 468 U.S. 737, 757 (1984). It is not necessary to show that the defendant's actions are the "proximate cause" of the plaintiff's injury or the "very last step in the chain of causation," but the links comprising the chain must be at least plausible, i.e. "not hypothetical or tenuous." Maya, 658 F.3d at 1070 (citing Allen, 468 U.S. at 757; Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 849 (9th Cir. 2002)). "In cases where a chain of causation involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, the Supreme Court and [the Ninth Circuit] have found the causal chain too weak to support standing at the pleading stage." Id. (citing Allen, 468 U.S. at 759; San Diego Cty. Gun Rights Comm. v. Reno, 98 F.3d 1121, 1126 (9th Cir. 1996)) (internal quotation marks omitted).

The injuries A4A complains of are not caused by the City but by the independent decisions of third parties not before the Court—specifically, the Port of Portland and the FAA—

and therefore A4A does not have constitutional standing to challenge the City's Fees. After the City adopted a new ordinance imposing the Fees in 2012, the Port sought the FAA's advice in determining "whether the [Fees] could be viewed as a cost of airport operation and maintenance, and therefore payable with airport revenue and chargeable to the air carriers . . . ." Whitlock Decl. ¶ 4, ECF 37. When the FAA concluded after an investigation that the Fees could be paid from airport revenues without running afoul of the statute, the Port relied on the FAA's advice and "passed through a portion of the [Fees] to tenant air carriers under the Port's agreement with such carriers." Whitlock Decl. ¶ 7–8.

The Port could have chosen to pay the Fees out of any number of other alternative revenue sources—the Port is a massive entity that operates marine terminals and oversees numerous business and industrial parks that combined generate over $60 million dollars in annual revenue wholly distinct from the revenue it raises by operating PDX. Transcript of Preliminary Injunction Hearing at 18, ECF 49; Port of Portland 2016–17 Proposed Budget, available at http://cdn.portofportland.com/pdfs/StrategicPlanBudget_17_Proposed.pdf. But relying on the FAA's advice, the Port independently decided to pass along a portion of the Fees to the Airlines as an operating cost of the airport.

A4A baldly asserts that the Port is unable "to act independently with regard to the Fees," but that is simply not borne out by the plausible factual allegations in its complaint or the record. In fact, A4A's briefing recognizes the autonomy of the Port and FAA regarding the Fees, and the primary role those entities played in causing the harm A4A alleges in this case. See Pl. Resp. at 2 ("[T]he Port should have refused to pay the Fees (but failed to do so), and . . . the FAA should have supported the airlines in response to their request for assistance (but repeatedly declined to do so) . . . ."). The independent decisions of the Port and the FAA about the Fees interrupts the

chain of causation that A4A must establish to show its standing to bring the present claim against the City.

The City bills the Port of Portland for the Airport's share of the Fees. Consistent with the FAA's advice and the terms of the lease between the Port and A4A's member Airlines that operate out of PDX, the Port passes on a portion of those Fees to the Airlines. The City does not control how the Port pays for the Fees, nor, as counsel stated at oral argument, does the City much care how the Fees are paid. The injury to A4A's member airlines is not "fairly traceable" to the City's actions, and thus A4A lacks constitutional standing to bring this case against the City. Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 41–42 (1976).

A4A cites a series of cases for the proposition that "indirect economic injury caused by a statute is sufficient to create standing." Pl. Resp. at 18 (citing, among others, Gen. Motors Corp. v. Tracy, 519 U.S. 278, 286 (1997); Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 287 (1984); Cent. Arizona Water Conservation Dist. v. EPA, 990 F.2d 1531, 1538 (9th Cir. 1993); Nat'l Audubon Society, 307 F.3d at 835). But those cases are readily distinguishable.

The plaintiffs in the General Motors and Bacchus Imports were purchasers of goods subject to state taxes imposed on out-of-state goods. Gen. Motors, 519 U.S. at 285–86 (plaintiff purchased natural gas for its Ohio plants from out-of-state producers); Bacchus Imports, 468 U.S. at 266 (plaintiffs were liquor wholesalers that paid a twenty percent tax on liquor purchased from out-of-state producers). In both cases, the Supreme Court held that the plaintiffs, despite not producing the goods being taxed, had standing to bring a Commerce Clause challenge against the taxes because they were directly liable to the state for the tax payments when they purchased the goods. Gen. Motors Corp., 519 U.S. at 286 ("But cognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the

class against whom a State ultimately discriminates, and customers of that class may also be injured . . . where the customer is liable for payment of the tax and as a result presumably pays more for the gas it gets from out-of-state producers . . . .); Bacchus Imports, 468 U.S. at 267 ("The wholesalers are, however, liable for the tax. Although they may pass it on to their customers, and attempt to do so, they must return the tax to the State whether or not their customers pay their bills.").

Here, by contrast, the Airlines are not directly liable to the City for paying the stormwater fees. The City Fees are levied against the Port, who then bills the Airlines. The City does not assess any Fees against the Airlines. If the Port refused to pay, the City could pursue a remedy against the Port; if the Airlines refused to pay the Port for the Fees, the Port could pursue the Airlines. But The City does not have a remedy against the Airlines if the Fees are not paid, because there is no legal or regulatory relationship between the City and the Airlines. See Gen. Motors Corp., 519 U.S. at 286 ("[C]ustomers of that class may also be injured . . . where the customer is liable for payment of the tax . . . .").

In Central Arizona Water Conservation District, the Ninth Circuit held that the plaintiffs had standing to challenge an EPA rule that would have required a nearby power plant to drastically reduce its sulfur dioxide emissions. 990 F.2d at 1533 (hereinafter "CAWCD"). The power plant was jointly owned by a number of entities, including the Bureau of Reclamation ("BOR"). Id. The plaintiff water district got electricity from the plant through a contract with the BOR, part of which required the plaintiff to "repay the major portion of the BOR's 24.3% share of the costs of installing and maintaining the emission controls required by" the EPA's new rule. Id. at 1534. The water district sued to stop the EPA's new rule, and the EPA asserted that the water district did not have standing. Id. at 1537. The EPA argued that the plaintiff's economic

injuries were actually caused by its contract with BOR, not the Agency's rule. Id. But the Court rejected that theory because the Final Rule was "the direct cause" of the plaintiff's liability. Id. The involvement of a third party did not cut off causation because the "government's action is substantially likely to cause the petitioner's injury despite the presence of intermediary parties." Id. (citation and quotation marks omitted).

Similarly here, the Port is required to pay the City's fees, and the Port passes on the costs of those fees by contract to the Airlines. But again the key difference in the present case is the Port's autonomy regarding how to pay for the stormwater fees. Unlike the BOR in the CAWCD case, who had no choice but to comply with the EPA rule and pass the costs on to the plaintiffs, the Port has the independent ability to decide how to pay the City's fees. Moreover, there is no evidence that the Port is required by law to follow the FAA's advice and pass along the Fees to the Airlines. Finally, A4A is essentially arguing that the Port is violating legal obligations it owes to A4A's member airlines. Def. Reply at 8. That too contrasts with the third party, the BOR, in CAWCD, who was complying with the EPA rule in paying its share for the plant's emissions upgrades, and is further evidence that the Port indeed acted independently in deciding how to pay the Fees or whether to pay them at all.

In sum, A4A does not have standing to bring this claim. Although a chain of causation can support standing in some instances, the clear instruction from the Supreme Court is that an "independent action" by a third party cuts off that causation. Here, the Port's actions in seeking the FAA's advice regarding the Fees and then following that advice in deciding to pass those Fees on to the Airlines operating out of the Airport demonstrate the Port's autonomy in deciding how to pay, or even whether to pay, the City's Fees. A4A cannot show that its alleged harms are "fairly traceable to the challenged action of the defendant," the City of Portland. Instead, the

harms A4A complains of are "the result of the independent action of some third party not before the court," the Port of Portland (and, perhaps, the FAA), and thus A4A does not have standing to bring this claim against the City. Lujan, 504 U.S. at 560–61 (quoting Simon, 426 U.S. at 41–42).

Because the Court concludes that A4A lacks standing, which in turn deprives the Court of subject matter jurisdiction over the claims presented, the Court does not reach any other questions raised by the parties.

## CONCLUSION

For the reasons stated, Plaintiff's motion for a preliminary injunction [11] is DENIED. Defendants' motion to dismiss [26] is GRANTED, and this case is dismissed with prejudice. All other outstanding motions are denied as moot.

Dated this  30  day of  May , 2016.

_____
MARCO A. HERNÁNDEZ
United States District Judge